UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CASE NO. 3:12-MC-00006-R

GARY W. MUFFLEY, REGIONAL DIRECTOR
OF THE NINTH REGION OF THE NATIONAL
LABOR BOARD, FOR AND ON BEHALF OF
THE NATIONAL LABOR RELATIONS BOARD                    PETITIONER

v.

JEWISH HOSPITAL & ST. MARY'S
HEALTHCARE, INC.
d/b/a OUR LADY OF PEACE                                RESPONDENT

MEMORANDUM OPINION

Before the Court is a petition for preliminary injunctive relief pursuant to § 10(j) of the

National Labor Relations Act (DN 1).  The parties have fully briefed the matter (DN 1-3; DN 17;

DN 19; DN 20) and it is now ripe for adjudication.  Though Respondent requests an in-person

hearing, the Court has reviewed the record and finds this measure unnecessary.  For the reasons

that follow, the petition is GRANTED IN PART AND DENIED IN PART.

BACKGROUND

This matter arises out of the suspension and termination of Amanda Doyle from Jewish

Hospital & St. Mary's Healthcare Inc., d/b/a Our Lady of Peace ("OLOP" or "Respondent"), a

health-care provider in Louisville, Kentucky.  Petitioner, the National Labor Relations Board

("Board" or "Petitioner"), asserts that OLOP disciplined Doyle because she assisted in a union-

organizing effort at one of OLOP's facilities, in violation of §§ 8(a)(1) and (3) of the National

Labor Relations Act ("Act").  OLOP counters that Doyle disobeyed its internal policies when she

harassed coworkers, distributed union materials on work time, and discussed non-work related

issues during the work day.  The instant petition for injunctive relief seeks to reinstate Doyle during the pendency of the administrative process, underway before the Board.

### I.        Factual Background

OLOP consists of two different hospitals in Louisville, Kentucky.  The health care consortium includes off-site facilities with residency programs for adults and adolescents suffering from mental and physical disabilities.  One such location that provides extended care to adolescents is the psychiatric residential treatment facility ("PRTF").  Currently, the American Federation of State, County, and Municipal Employers ("AFSCME" or "union") Council 62 is attempting to unionize the approximately 260 employees working throughout OLOP, including those at the PRTF.

Doyle was hired as a mental health associate in 2003 and, before her termination, worked at PRTF with 20 to 25 other employees.  The primary role of mental health associates at PRTF is patient supervision.  Principally, these employees shepherd the adolescent patients from one activity to another, watch them during recreation periods, and perform nightly rounds to check on the patients as they sleep.  Though they are "on-duty" during these tasks, the mental health associates frequently discuss non-work related topics during the supervisory periods.[1]  On occasion, employees at PRTF solicit funds from one another to raise money for various charitable and non-charitable organizations.  Employees have sold and distributed confectionery items, women's beauty products, raffle tickets, and coupons in their efforts to raise money.

In the middle of 2010, Doyle became actively involved with AFSCME's campaign to unionize the workers at OLOP.  She visited the homes of other OLOP employees, and while at

---

[1] According to the testimony at the hearing, much of the "supervision" the mental health associates provide amounts to standing around and watching the adolescent patients play outside, attend school lessons, and sleep. Since many of the mental health associates are not directly interacting with the adolescents during these periods, they intermittently converse on topics unrelated to their employment.

work, she spoke openly about the union and handed out union literature.  Though she testified at the hearing that all of her conversations about the union occurred while she was on break, ample evidence contradicts this assertion.  The testimony shows Doyle promoted the union both on non-work time in non-patient care areas as well as in work areas while she and other mental health associates supervised patients.  The administration of OLOP, including its CEO, Jennifer Nolan, knew of Doyle's advocacy for the AFSCME before the events of September 2011.

On September 9, 2011, management for OLOP distributed a letter to its employees addressing the ongoing efforts to unionize the facility.  OLOP characterizes the letter as simply informative; Doyle and the Board see the letter as a "union-busting" tactic to discourage the organization.  In any event, shortly after the dissemination of this letter, several employees contacted their respective supervisors to complain about interactions with Doyle.[2]  While the circumstances of each encounter differed somewhat, the thrust of each complaint was as follows: (1) Doyle approached the employee during work hours, began to discuss the union, and attempted to gauge the employee's interest in joining; (2) the employee would usually say they were not interested in the union or attempt to change the subject; (3) Doyle would then persist in her attempts to engage the employee in a conversation about the union.  The employees who spoke with their supervisors described Doyle's tactics as "annoying" and "irritating," but some went so far as to say Doyle had "harassed" them.  A total of six employees told their supervisors about union-related conversations they had with Doyle.

Prior to the events of September 2011, OLOP instituted both a non-harassment policy and a policy against soliciting and distributing non-work related items during work time.  Harassment is defined as "any action, which singles out a team member, to the team member's detriment,

---

[2] From the record, it is unclear if there was a causal connection between the complaints over Doyle's behavior and the letter of September 9 or if the temporal proximity was merely happenstance.

because of race, sex, religion, national origin, sexual orientation, gender identity, veteran status, or disability." Petitioner's Ex. 2, p. 2. Verbal, physical, or visual harassment "constitute[s] team member misconduct that is demeaning to another person, and which undermines the integrity of the employment relationship." Petitioner's Ex. 2, p. 1. Harassment by employees can be a "critical offense" that justifies termination. However, according to Janet Ostbloom, a human resources consultant for OLOP, only one person in the past four years was terminated for harassment when the employee threatened to injure a patient. HR p. 474-75.

In addition, employees of OLOP "may not solicit, by any method, for any purpose during working time or in immediate patient care areas" or "distribute, by any method, literature or information of any type or for any purpose during working time, in working areas, or in patient care areas." General Counsel ("GC") Ex. 7, p. 2. "Solicitation and distribution is prohibited if either the soliciting or distributing team member, or the team member being approached is on working time." GC Ex. 7, p. 2. OLOP's policy expressly prohibits soliciting funds for Girl Scout cookies and other "outside charitable organizations." GC Ex. 7, p. 2. So far as Ostbloom knows, no one has ever been punished for violating the non-solicitation and distribution rule. HR p. 474-75.

On September 22, 2011, Doyle was escorted into her supervisor's office where she met with her supervisor and Ostbloom. They informed Doyle that her discussions about the union during work constituted both distributing non-work related materials and discussing non-work related topics during working hours, in violation of OLOP's internal policies. Doyle denied these accusations but was placed on investigative time off ("ITO") while OLOP conducted an internal inquiry.

During the week-long investigative period, Ostbloom interviewed the complainants with whom Doyle had spoken.  Two of these employees, Allen Ryan and James Stone, testified that while Doyle's actions were annoying, they did not rise to the level of harassment.  HR p. 61-63, 200.  Though Steven Carter testified that he felt like Doyle's behavior was "borderline harassment," he also submitted an affidavit where he characterized her behavior as "very irritating."  HR p. 518, 533.  The two other employees, Lewis Gilbert and Wrae Sanders, expressly stated to their supervisors that they felt Doyle had harassed them.  HR p. 288-89, 354-55.  Most of these employees agreed her badgering about the union did not interfere with their supervisory duties even if it occurred in front of patients.  Nevertheless, Ostbloom felt the conduct justified discharge based on the number of complaints about Doyle.

On September 28, 2011, the administration called Doyle back to work to discuss the results of the investigation.  There, Doyle was terminated for "[m]ultiple violations of distributing non-work related materials and discussing non-work related topics related to supporting an organization during working time."  HR p. 111-16; GC Ex. 6.  Management for OLOP determined Doyle's behavior warranted termination since it rose to "a level of being disruptive to team members and to the level of harassment."  HR p. 111-16; GC Ex. 6.  Subsequently, OLOP denied Doyle's appeal of her termination that she pursued through its internal grievance process.

## II.     Procedural Background

On October 12, 2011, the AFSCME filed an unfair labor practice charge against OLOP, alleging Doyle's termination violated §§ 8(a)(1) and (3) of the Act.  The union asserted Doyle's termination was predicated on her protected activity and OLOP dismissed her to stymie the fledgling union movement.  A complaint against OLOP followed from the Regional Director for

Region 9 of the Board, which declared that OLOP had disparately enforced its harassment and non-solicitation and distribution policies against Doyle for the purpose of discriminating against union activities.

A hearing was held before Administrative Law Judge Arthur J. Amchan on January 24 and 25, 2012.  The Board moved to amend its original complaint to add another violation of § 8(a)(1), stemming from the coercive interviews of the complainants during Doyle's ITO.  HR p. 7.  On March 5, 2012, Judge Amchan granted the Board's motion to amend and ruled that OLOP actions "violated §§ 8(a)(1) and (3) by placing [Doyle] on [ITO] and in terminating her employment."  OLOP has filed exceptions to Judge Amchan's decision, seeking the overturn of his ruling.  This motion is currently before the Board.

The petition for injunctive relief was filed on February 22, 2012.  It seeks the interim reinstatement of Doyle to her former position of employment.  Petition, DN 1, ¶ 2(a).  The Board requests miscellaneous relief as well, such as posting any favorable ruling by the Court in OLOP's facilities and a meeting with management and employees acknowledging and explaining the Court's order.  Petition, DN 1, ¶¶ 2(a), (b).

## STANDARD

Section 10(j) of the Act permits the Board to petition a district court for either temporary injunctive relief or a restraining order during the pendency of the Board's decision on unfair labor practices.  *See* 29 U.S.C. § 160(j).  "Administrative review is often slow therefore, interim injunctive relief occasionally may be necessary to preserve the remedial power of the Board.  For such cases, Congress has provided the Board with the ability to petition the district court to enjoin allegedly unfair labor practices pending the Board's substantive review of those

practices." *Kobell v. United Paperworkers Intern.*, 965 F.2d 1401, 1406 (6th Cir. 1992) (citing

*Arlook v. S. Lichtenberg & Co.,* 952 F.2d 367, 369 (11th Cir. 1992)).

"'Section 10(j) proceedings are merely ancillary to unfair labor practice proceedings to be

conducted before the Board. The district courts are *not* to adjudicate the merits of the unfair

labor practice case. The question of whether a violation of the Act has been committed is a

function reserved exclusively to the Board, subject to appellate court review of final Board

orders.'" *Fleischut v. Nixon Detroit Diesel, Inc.,* 859 F.2d 26, 28 (6th Cir. 1988) (quoting

*Glasser v. ADT Sec. Services, Inc.*, 379 F. App'x 483, 485 (6th Cir. 2010) (emphasis in

original)). To prevail on a petition for injunctive relief under this section, the Board must show

"(1) there is 'reasonable cause' to believe that unfair labor practices have occurred, and that (2)

injunctive relief with respect to such practices would be 'just and proper.'" *Ahearn v. Jackson*

*Hosp. Corp.,* 351 F.3d 226, 234 (6th Cir. 2003) (quoting *Schaub v. W. Mich. Plumbing &*

*Heating, Inc.,* 250 F.3d 962, 969 (6th Cir. 2001)).

## DISCUSSION

### I.      Reasonable Cause

The burden demanded to show reasonable cause is "relatively insubstantial," as it only

requires the district court to confirm that the allegations of unfair labor practices are "'substantial

and not frivolous' and that the facts of the case be consistent with the Board's legal theory." *Id.*

at 237 (quoting *Schaub,* 250 F.3d at 969). The district court may not opine on conflicting

evidence or make credibility determinations, but instead must limit its inquiry to whether the

facts "'could support the Board's theory of liability.'" *Id.* (quoting *Kobell*, 965 F.2d at 1407). In

*W.F. Bolin Co. v. NLRB*, 70 F.3d 863 (6th Cir. 1995), the Sixth Circuit provided a non-exclusive

7

list of factors to evaluate whether an employer bears a discriminatory animus toward union

activities:

> Discriminatory motivation may reasonably be inferred from a variety of factors, such as the company's expressed hostility towards unionization combined with knowledge of the employees' union activities; inconsistencies between the proffered reason for discharge and other actions of the employer; disparate treatment of certain employees compared to other employees with similar work records or offenses; a company's deviation from past practices in implementing the discharge; and proximity in time between the employees' union activities and their discharge.

*Id.* at 871.

The provisions of the Act at issue are §§ 8(a)(1) and (3).  Together, they hold that

employers engage in "unfair labor practice[s]" when they "interfere with, retrain, coerce

employees in the exercise of the rights guaranteed in section 157" and "discourage membership

in any labor organization."  29 U.S.C. § 158(a)(1), (3).  The termination of an employee for

participating in union activity violates these statutes.  *See Birch Run Welding & Fabricating, Inc.*

*v. NLRB,* 761 F.2d 1175, 1179 (6th Cir. 1985).  Thus, for "reasonable cause," the relevant

inquiry is if OLOP's suspension and termination of Doyle were motivated by anti-union-animus.

*Ahearn*, 351 F.3d at 238 (citing *NLRB v. Cook Family Foods, Ltd.,* 47 F.3d 809, 816 (6th Cir.

1995)).  "If [the Board] demonstrates the termination was motivated at least in part by anti-union

animus, the burden shifts to [OLOP] to show that it would have fired the employee anyway."  *Id.*

(citing *NLRB v. Transp. Mgmt. Corp.,* 462 U.S. 393, 399-403 (1983)).

The Board possesses adequate evidence of anti-union sentiment in the decision to

suspend and terminate Doyle.  Foremost, sufficient proof was offered on the disparate

application of OLOP's conduct policies.  The solicitation of contributions for outside

organizations by employees was not uncommon, even if it was in direct contravention of the no-

solicitation and distribution policy.  HR p. 115, 121-30, 229-33, 262.  Despite management's

neglect to discipline her coworkers for their infractions, Doyle was suspended and then terminated for similar behavior without any sort of warning.  With respect to the harassment policy, OLOP's own definition of "harassment" prohibits inappropriate commentary on race, religion, sex, and other protected classes.  Petitioner's Exhibit 2, p. 2.  Doyle's conversations with her coworkers came nowhere close to the grievous breaches of etiquette required to meet the policy's standard.  Even with the difficulty in reconciling Doyle's behavior with OLOP's definition, several employees that gave statements to management expressly rejected the term "harassment" when describing their conversations with Doyle.  HR p. 53, 200.  Still, Ostbloom relied on these employee's complaints when deciding to characterize Doyle's behavior as contrary to the harassment policy.  HR p. 455-46, 484, 486-87.  Management further justified Doyle's termination in part on her discussions of non-work related topics during working time.  GC Ex. 6.  Ostbloom made clear however that no internal policy prohibited non-work related conversations in work areas, and the mental health associates openly admitted they speak about non-work related topics quite often.  Accordingly, there are evidential inferences promoting the Board's position.

Other facts in the record support the Board's theories.  There is evidence tending to show management at OLOP knew of, disliked, and campaigned against the organizing effort.  Members of the management team such as Nolan and Ostbloom admitted either at the hearing or to their employees that they did not support unionization.  HR p. 458, 543.  The record also reveals supervisors pulled employees aside during work hours to provide reasons to reject the movement and to disseminate literature critical of union membership.  HR p. 205, 225, 275, 492-93.  Additionally, questions exist about Ostbloom's investigation.  The record arguably reflects that Ostbloom went looking for Doyle's connections to the union.  HR p. 193-94, 491-95.  This

9

would support the Board's position that Doyle's relationship to the union, and not the complaints about harassment, sparked OLOP's investigation. When she conducted her interviews with the complainants, the notes Ostbloom took during those conversations contained inaccuracies that made Doyle's behavior seem worse. HR p. 189-214. Though OLOP disagrees with the probative value of these errors, their existence lends support to the Board's theories. Perhaps most important, Judge Amchan's decision weighs in favor of the allegations of unfair labor practices. *See Ahearn*, 351 F.3d at 238 (ALJ's decision supports a finding of reasonable cause). These facts, along with the disparate application of the conduct policies to Doyle, indicate the Board's allegations are substantial and not frivolous.

Taking the record as a whole, the Board has adequately demonstrated reasonable cause for the proposed violations of the Act.

## II.     Just and Proper

The just-and-proper standard measures whether a temporary injunction is necessary for the protection of the Board's remedial powers. The relief contemplated under § 10(j) is only "'reasonably necessary to preserve the ultimate remedial power of the Board and is not to be a substitute for the exercise of that power.'" *Id*. at 239 (quoting *Schaub,* 154 F.3d at 279). "Interim judicial relief is warranted whenever 'the circumstances of a case create a reasonable apprehension that the efficacy of the Board's final order may be nullified, or the administrative procedures will be rendered meaningless.'" *Sheeran v. Am. Commercial Lines, Inc.,* 683 F.2d 970, 979 (6th Cir. 1982) (quoting *Angle v. Sacks ex rel. NLRB,* 382 F.2d 655, 660 (10th Cir. 1967)).

When deciding if injunctive relief is just and proper, the court must consider if this remedy is "'necessary to return the parties to status quo pending the Board's proceedings in

order to protect the Board's remedial powers under the NLRA, and whether achieving status quo

is possible.'" *Kobell,* 965 F.2d at 1410 (quoting *Gottfried v. Frankel,* 818 F.2d 485, 495 (6th

Cir. 1987)).  The status quo is the state of affairs in place before the alleged unfair labor practice

occurred.  *Calatrello v. Automatic Sprinkler Corp. of Am.*, 55 F.3d 208, 214 (6th Cir. 1995).

Courts often order the interim reinstatement of an employee to combat the "chilling effect" that a

termination could have on the efforts to unionize.  *See e.g.*, *Ahearn*, 351 F.3d at 239-40

(upholding the reinstatement of four employees when fired after strike); *Pascarell*, 904 F.2d at

874 (district court's denial of injunction reversed and reinstatement of six employees ordered);

*Frankel*, 818 F.2d at 495-96 (reinstatement proper considering the important role employee

played in developing union support).

OLOP contends the Board cannot meet the just-and-proper standard for three reasons.

First, it says any injunction ordered by the Court would be short lived since the ALJ will make

his final ruling within a matter of weeks.  This objection is better classified as a protest against

the Board's delay in seeking injunctive relief under § 10(j).  When deciding if injunctive relief is

just and proper, "[d]elay is a permissible consideration, especially when the harm has already

occurred and the parties cannot be returned to status quo."  *Hooks v. Ozburn-Hessey Logistics,*

*LLC*, 775 F. Supp. 2d 1029, 1053 (W.D. Tenn. 2011) (citing *Frankel,*818 F.2d at 495).  The

Sixth Circuit has warned however that the scrutiny placed on the delay before requesting

injunctive relief is better reserved for determining if the Board's remedial powers can be

protected and if reaching the status quo is possible.  *See Frankel,* 818 F.2d at 495 (referring to

the "appropriate focus" under the just-and-proper analysis).  Moreover, other courts have granted

injunctions with similar delays between the original charge and the Board's petitions under

§10(j).  *See e.g.*, *Sharp v. Webco Indus., Inc.*, 225 F.3d 1130, 1135-37 (10th Cir. 2000) (seven-

month delay); *Hirsch v. Dorsey Trailers, Inc.*, 147 F.3d 243, 248-49 (3d Cir. 1998) (fourteen-month delay); *Pascarell v. Vibra Screw Inc.*, 904 F.2d 874, 881 (3d Cir. 1990) (six-month delay). Accordingly, the Court rejects OLOP's position that the seven-month delay by the Board obviates the need for an injunction.

Second, OLOP asserts injunctive relief is unwarranted because Doyle's termination has not harmed the union organizing effort. OLOP argues the AFSCME has been unsuccessful at garnering support among employees during its fifteen-month membership drive. Most employees at the hearing testified they were not interested in joining the union and Doyle's pestering did nothing to change their minds. Thus, OLOP insists the union's failure to gain traction was not the result of Doyle's termination and its "chilling effect" on the movement, but because employees are generally disinterested in the organization.

OLOP's proclamations about the tepid interests in organizing ring hollow in light of its efforts to undermine the union campaign. Management crafted and hand-delivered literature discouraging membership amongst its employees. HR p. 102-06, 204-05, 274-75, 535-40; General Counsel Ex. 5. Supervisors followed up one-on-one with employees during work to discuss the union campaign and its possible effects on OLOP. HR p. 102-06, 204-05, 274-75, 535-40. Employees who admitted to having interactions with pro-union employees were segregated and questioned by their supervisors and the director of human resources. HR p. 49-50. OLOP is incorrect to cite the lack of union support as a basis to reject this motion considering its coordinated effort to dampen interest in the movement.

Furthermore, the struggles of the union do not disfavor injunctive relief. In cases where unions are newly organized or in their infancies, misconduct by management can cause irreversible damage. *See Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 500-01 (7th Cir.

2008) (the risk of management's ability to chill union membership is particularly great "in cases involving fledgling unions, where the passage of time is especially critical"); *Ahearn*, 351 F.3d at 239 (making light of the immaturity of the union efforts when deciding to reinstate employees); *Arlook v. S. Lichtenberg & Co., Inc.*, 952 F.2d 367, 373 (11th Cir. 1992) (where union was only recently certified and employees were bargaining their first contract, these facts made organization "highly susceptible to management misconduct"). The difficulties of unionization are only compounded when an employer wrongly terminates important figures in the organization effort. *See Pye v. Excel Case Ready*, 238 F.3d 69, 75 (1st Cir. 2001). Here, Doyle actively solicited employees to join the union both outside and inside the walls of PRTF. The local staff organizer for the AFSCME and other pro-union employees with OLOP agreed that Doyle's work with and enthusiasm for the union made her an important person in the organization drive. Thus, the nascent union movement and the critical role Doyle played make her reinstatement just and proper.

Third, in response to the petition, OLOP proposes that the Board has not put forth adequate evidence to show Doyle's termination caused harm to the union campaign. The Court disagrees. Richard Becker, a union organizer, testified during the hearing that employees at OLOP were hesitant to speak with him after Doyle's discharge. HR p. 25. The number of new recruits for the campaign also declined after her dismissal. HR p. 25. Terrance Gibbs, a current employee with OLOP in another facility, stated that he curbed his recruiting efforts after Doyle was terminated and that employees were disinclined to talk about the union. Gibbs Affidavit, p. 1-2. Gibbs continued that his wife, an employee at OLOP, ceased talking about the union entirely because she was afraid of being fired. Gibbs Affidavit, p. 2. In the days following Doyle's termination, union-supporter James Ewing wrote to the CEO of OLOP and attempted to

13

disassociate himself from the union for fear of similar retaliation.  HR p. 238-41.  Although this evidence does not conclusively show Doyle's termination has handicapped the union, the Court believes an adequate foundation has been offered to warrant this injunction.[3]  *See Boren v. Continental Linen Services, Inc.*, No. 1:10-CV-562, 2010 WL 2901872, at \*5 (W.D. Mich. July 23, 2010) (conclusive proof not required under just-and-proper standard for the issuance of an injunction); *Catatrello v. Carriage Inn*, No. 2:06-CV-697, 2006 WL 3230778, at \*23 (S.D. Ohio Nov. 6, 2006) (employee testimony that there was "some erosion of Union support" was enough for injunctive relief).

The evidence that Doyle's termination adversely impacted organizing efforts coupled with the tenuous state of the union, OLOP's attempts to discourage membership, and Doyle's prominent role in the campaign convinces the Court that the injunction is just and proper.  The longer OLOP is permitted to chill participation in the union, the more likely irrevocable damage will done to the organizing effort before the Board issues it final order.  *See Sheeran,* 683 F.2d at 979 ("Interim judicial relief is warranted whenever 'the circumstances of a case create a reasonable apprehension that the efficacy of the Board's final order may be nullified, or the administrative procedures will be rendered meaningless.'" (quoting *Angle v. Sacks ex rel. NLRB,* 382 F.2d 655, 660 (10th Cir. 1967))).  As there is reasonable cause to believe OLOP's actions have harmed the union movement, it is proper to return the parties to the status quo.

### III.    Scope of injunctive relief

---

[3] OLOP objects to hearsay statements introduced by the Board in support of the Petition, specifically remarks employees made to Richard Becker about the decrease in pro-union activity after Doyle's termination. Courts have considered such comments in the context of the just-and-proper analysis while deciding whether a preliminary injunction under § 10(j) should be granted. *See Asseo v. Pan Am. Grain Co., Inc.*, 805 F.2d 23, 25-26 (1st Cir. 1986) (court was permitted to accept transcripts and affidavits with hearsay statements in injunction proceeding); *Asseo v. Centro Medico del Turabo, Inc.*, No. 89-0490CC, 1989 WL 130007, at \*10 n. 2 (D.P.R. Aug. 9, 1989) (hearsay remarks made to union president were admissible to evaluate if injunction was "just and proper"). In addition, stringent adherence to rules of evidence is disfavored among courts reviewing petitions for injunctive relief. *E.g., Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004) (collecting cases).

Doyle's interim reinstatement to her former position with her previous wages and working conditions will return the parties to the status quo. The Court also finds that OLOP should be enjoined and restrained from engaging in the practices that gave rise to the current petition – suspending and discharging an employee for engaging in protected activity under the Act. However, the additional relief the Board requests, posting this order in public places and assembling employees where the order can be read, is both unnecessary and over burdensome.

## CONCLUSION

The Court recognizes that OLOP denies that it suspended and terminated Doyle for engaging in protected activity, and this opinion is not a dispositive ruling on these alleged violations of the Act. Rather, the Court finds there is reasonable cause to believe unfair labor practices have occurred and Doyle's reinstatement is necessary for a return to the status quo. For the forgoing reasons, the Court GRANTS IN PART AND DENIES IN PART the petition for injunctive relief. The Court will issue an order reflecting the following relief:

(1) Within five (5) days of the Court's order, Respondent shall reinstate Amanda Doyle to her former position of employment with her previous wages and working conditions. If such a position is no longer available, Respondent shall provide Amanda Doyle with a comparable position, so long as it does not include a reduction in wages or less agreeable working conditions. The interim reinstatement shall endure for such time until the Board's final disposition of the administrative proceeding.

(2) Respondent shall not suspend, discharge, or otherwise discriminate against its employees who support the union or engage in protected activities under the Act.

15

(3) Respondent shall not disparately enforce its work rules, including its no solicitation,

no distribution, and harassment rules, on the basis of union activities.

(4) Respondent shall not prohibit discussion of the union amongst employees while at

work, unless such discussions interfere with work-related activities or are in violation

of Respondent's established policies and procedures.

(5) Respondent shall not suspend, discharge, or otherwise discipline Amanda Doyle or

any other employee for discussing the circumstances of this case and the Court's

order of reinstatement.

(6) Within ten (10) days of the Court's order, Respondent or a representative of

Respondent shall file with the Court an affidavit specifying in detail the actions it has

undertaken to comply with the order.